## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS V. DURAN,** | : | **CIVIL ACTION NO. 4:14-CV-2047** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **COUNTY OF CLINTON, JEFFREY** | : | |
| **SNYDER, ROBERT SMELTZ, and** | : | |
| **JOEL LONG,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Plaintiff Thomas V. Duran ("Duran") commenced this action against his former employer, defendant Clinton County (the "County"), and the three members of the Clinton County Board of Commissioners (the "Board of Commissioners"). Duran asserts claims for discrimination under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, as well as a common-law claim for tortious interference with contractual relationships. (Doc. 55). Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 61).

## I. **Factual Background & Procedural History**[1]

The County is governed by a three-member Board of Commissioners. (See Doc. 61-1 ¶¶ 3-6). Defendants Robert Smeltz ("Commissioner Smeltz") and Jeffrey Snyder ("Commissioner Snyder") served as chairman and vice-chairman of the Board of Commissioners, respectively. (Id. ¶¶ 4-5). Defendant Joel Long ("Commissioner Long") served as the third member of the Board of Commissioners at all times relevant to this case. (Id. ¶ 6).

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial. See id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 61-1, 63). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

In addition to providing responses to each paragraph in defendants' statement of material facts, Duran's responsive statement of material facts includes a section styled as "Counterstatement of Material Facts Relevant to the Motion," consisting of an additional 77 numbered paragraphs. (Doc. 63 at 47-62). Neither Federal Rule of Civil Procedure 56 nor Local Rule 56.1 authorizes this portion of his filing, and Duran did not request leave of court therefor. Nevertheless, the court has considered and scrutinized this supplemental information and defendants' response thereto, (Doc. 65), as well as the entire record to determine the uncontroverted facts of this matter.

Duran's responsive statement of material facts begins with approximately ten pages of argument, (Doc. 63 at 1-10), wherein Duran accuses defendants of spoliation, (id. at 5-8). This portion of Duran's filing contravenes both the federal and local rules and unfairly prejudices defendants who complied with the court's page and word limitations. See LOCAL RULE OF COURT 7.8. Therefore, we will not consider this portion of Duran's responsive statement of material facts. To the extent Duran wishes to bring spoliation issues to the court's attention, he may do so by engaging in appropriate motion practice.

The Clinton County Prison Board (the "Prison Board") oversees the Clinton County Correctional Facility (the "Facility"), (see id. ¶¶ 4-8; Doc. 63 ¶¶ 4-8), and recommends Facility personnel decisions (e.g., hiring, termination) to the Board of Commissioners for approval, (see Doc. 61-6, Snyder Dep. 28:4-29:7).[2]  In January 2012, a new Prison Board took office, consisting of Commissioners Smeltz, Snyder, and Long, as well as the County's district attorney; a state court judge; the County treasurer; and the County sheriff.  (Doc. 61-1 ¶¶ 4-7, 13).  Commissioner Snyder served as Prison Board chairman.  (Id. ¶ 4).

Duran served as warden of the Facility from 1993 to 1997, and again from 2000 through his termination in 2012.  (Id. ¶¶ 1-2, 9).  Duran worked for the County without a written employment contract until 2007.  (Doc. 61-2, Duran Dep. 55:19-22, Aug. 16, 2016 ("Duran Dep. I")).  Duran testified that he was considering other positions at that time and was concerned about the ramifications on his job security if the County decided to "go to Home Rule."  (Id. at 53:22-54:13).  To ensure Duran's continued services as warden, the then-Board of Commissioners awarded him a five-year employment contract to commence on November 5, 2007.  (Doc. 61-1 ¶¶ 10-11; Doc. 63 ¶¶ 10-11; Duran Dep. I 54:13-18; see Doc. 61-3).  The County and the Prison Board could terminate the contract "only upon a finding of dishonesty or gross malfeasance by [Duran]."  (Doc. 61-3 at 3).

---

[2] Deposition transcripts have been filed by the parties at numerous, separate docket entries.  We will cite to full deposition transcripts as "[Name] Dep.," without repeating the docket entry citation *passim*.  We employ this citation convention for any full deposition transcripts cited throughout this memorandum.  To the extent partial deposition transcripts are cited, we will retain docket entry citations for ease of location.

## A. Duran's Medical Issues

Duran experienced a variety of significant health issues throughout his tenure as warden, including, *inter alia*, "arthritis and contracting MRSA." (Doc. 61-1 ¶ 12). Duran required eight surgeries between September 2008 and September 2011 and time away from work to recover. (Id.; Doc. 55 ¶¶ 35(c)-(j); Doc. 57 ¶ 35). Duran testified that he frequently worked a full day at the Facility and then brought work home in the evenings. (Duran Dep. I 42:18-44:13; Doc. 65-2 at 1). In 2009 or 2010, Duran began utilizing a Comcast business account and work laptop at home to access the Facility's cameras, phone systems, and inmate accounts. (Duran Dep. I 40:20-42:2). When he missed work due to medical issues, Duran would "ma[ke] up a lot of it working at home" and used the laptop to monitor the Facility from his hospital bed and his home. (Id. at 44:14-22, 47:23-48:20).

In early January or February 2012, Commissioner Snyder allegedly learned that Duran was "spending an hour or less a day at the facility." (Snyder Dep. 20:21-25). Commissioner Snyder and another Prison Board member met with Duran and informed him that County policy supposedly required the warden to "be present at the facility eight hours a day and on-call 24/7, unless the warden notifies someone as to why he or she is not there." (Id. at 20:25-21:9; cf. Doc. 63-21 at 7). Commissioner Snyder stated that he wanted Duran on site eight hours a day. (Snyder Dep. 21:10-12; Doc. 61-9, Duran Dep. 34:18-20, Apr. 10, 2018 ("Duran Dep. II"); see also Doc. 63-22, Bechdel Dep. 16:9-15). Duran claims that he replied to Commissioner Snyder by noting that he just had both knees replaced a few months prior and was "still healing" but that Commissioner Snyder maintained that he wanted Duran present

eight hours per day. (Duran Dep. II 34:22-35:5). Commissioner Snyder denied that Duran "made . . . reference to any medical issues." (Snyder Dep. 21:13-16). When asked what informed Duran's belief that the commissioners harbored disdain for his health-related accommodations, Duran testified that it was "more speculation than having . . . any evidence to say that." (Duran Dep. II 28:18-29:3).

### B. Medical Provider Issues

Clinton Medical Associates ("Clinton Medical") is the contracted medical provider for the Facility. (Duran Dep. I 25:4-9). Clinton Medical physician Michael Greenberg ("Dr. Greenberg") treated patient inmates at the Facility. (Id. at 25:13-23). In January 2012, Commissioner Snyder discovered that Clinton Medical was purportedly billing the County "for items which were not within [] the scope of the contract." (See Doc. 61-5 ¶ 5; Snyder Dep. 56:19-57:15). Dr. Greenberg allegedly "admitted that he actually was over-billing" when confronted at a Prison Board meeting. (Snyder Dep. 79:12-17).

Commissioner Snyder tasked Duran to review past invoices and ascertain whether and how much Clinton Medical had overbilled. (Doc. 61-5 ¶ 5; Duran Dep. I 25:24-26:10; Doc. 63-35 at 3). Between January and September 2012, the Prison Board repeatedly asked Duran about the status of this assignment. (Doc. 61-5 ¶ 6; Doc. 63-35 at 3; see Snyder Dep. 56:19-57:15). In September 2012, Duran provided a memo to the Prison Board indicating that medical staff members' failure to sign in and out of the Facility explained a portion of the alleged overbilling. (See Doc. 63-12 at 2; Snyder Dep. 80:20-82:4). Duran testified that he was fired before he could complete a full review. (Duran Dep. I 26:11-16, 67:3-16).

The Prison Board also learned that Dr. Greenberg was performing surgery on inmates at an offsite location in violation of the contract with Clinton Medical. (Snyder Dep. 57:17-22; Doc. 61-5 ¶¶ 7-8; Doc. 63-3 at 2; see Duran Dep. I 26:17-27:7). Duran was aware of this practice and testified that "at the time it was cheaper in the long run to send them there" than to a hospital. (Duran Dep. I 69:1-71:7). At a May 2012 Prison Board meeting, Commissioner Snyder directed Duran to bring an end to this practice. (Doc. 61-5 ¶ 7; Duran Dep. I 27:10-14; see Snyder Dep. 56:19-57:22). The parties disagree as to whether Duran did so. Duran claims that he instructed Dr. Greenberg to stop treating inmates offsite. (Duran Dep. I 27:10-24, 69:24-70:6). Commissioner Snyder represents that Duran did not, resulting in an investigation by the Pennsylvania Department of Corrections (the "Department"). (Doc. 61-5 ¶ 8; see Snyder Dep. 77:21-78:8).

### C.    Commissary Issues

The Facility maintained a commissary through which inmates could use personal funds to purchase items such as snacks or toiletries. (Duran Dep. I 21:16-22:8). When an inmate made a purchase, Facility staff deducted the price of the item from the inmate's account and then placed an order with Oasis Commissary ("Oasis") for the item. (Id. at 22:8-22). Oasis then filled the order and delivered the item to the Facility for the inmate. (Id. at 22:22-25). Facility policy mandated that any profits generated by the commissary were to be used to purchase goods that benefitted the entire inmate population, as recommended and approved by the warden. (Id. at 19:12-20:1; Doc. 61-5 ¶ 16).

Commissioner Snyder received a letter from the County's auditors' office dated April 2, 2012, detailing items on the Facility's commissary account that were "questionable." (Doc. 61-4). The auditors' office identified the following charges as suspect: monthly Comcast internet service bills for a private residence, hotel-related expenses, receipts for iPad and iPod accessories, screen printing bills from an embroidery shop, and numerous meal expenses lacking receipt documentation. (Id.; Doc. 61-5 ¶¶ 17-18). The letter indicated that one of the hotel bills was in Duran's wife's name. (See Doc. 61-4). Commissioner Snyder alleges that Duran used the commissary account to pay for these various expenses to benefit himself and other Facility staff. (Doc. 61-5 ¶ 16). Duran testified that these expenses were related to business trips or to facilitate working from home. (Duran Dep. I 58:14-64:8). He explained that his wife accompanied him on a business trip and that the Prison Board never inquired with him about these charges prior to his termination. (Id. at 61:6-13, 64:9-13; 84:20-85:10).

Duran had also signed a new contract with Oasis to provide commissary services. (Duran Dep. I 21:2-7; Doc. 61-5 ¶ 15). Oasis provided gym equipment for use by Facility staff in conjunction with that contract. (Id. at 23:5-11). Commissioner Snyder questioned Duran at the July 2012 Prison Board meeting about the contract and gym equipment. (Doc. 61-5 ¶ 15). The record is unclear as to whether Facility funds were used to purchase the gym equipment for staff use or whether Oasis provided the equipment to Duran and his staff as a complimentary "incentive" for awarding Oasis the contract. (See id.; Duran Dep. I 21:2-10; Snyder Dep. 59:3-22, 84:16-25). Duran testified that other potential commissary vendors

offered similar incentives but that he chose Oasis because the Facility "had been with Oasis for years and [he was] satisfied with their service." (Duran Dep. I 21:11-15). The Prison Board subsequently voted to require all contracts to be submitted to and approved by the Prison Board and the County solicitor prior to signing. (Doc. 61-5 ¶ 15).

### D.  Facility Financial Issues

Throughout 2012, the new Prison Board, led by Commissioner Snyder, was focused on reducing the Facility's operating costs and expenses. (See Duran Dep. I 17:18-18:10, 74:4-75:5, 75:19-76:18; Doc. 61-5 ¶ 13). The Facility housed inmates for the Department as well as other counties and charged a *per diem* fee. (Duran Dep. I 33:18-34:5; see Snyder Dep. 82:12-21). The Facility received a *per diem* rate of $47 under the contract with the Department in 2012. (Duran Dep. I 34:24-35:8; Snyder Dep. 82:19-83:1). Neighboring counties received *per diem* rates ranging from $50 to $65 under their respective contracts. (Duran Dep. I 35:9-19; Doc. 61-5 ¶ 10).

Duran was responsible for renegotiating the Department contract by May 1, 2012. (See Doc. 65-1 ¶ 9; Duran Dep. I 34:6-17). Commissioner Snyder avers that Duran failed to enter negotiations with the Department before the deadline. (Doc. 61-5 ¶ 9). The *per diem* rate therefore remained at $47 for the balance of 2012. (Id.) Using a neighboring county's *per diem* rate of $65, Commissioner Snyder projected that Duran's failure to renegotiate the contract resulted in a loss to the Facility of at least $1,800 per day. (Id. ¶ 10). Commissioner Snyder testified that the County subsequently renegotiated with the Department for a higher *per diem* rate. (Snyder Dep. 83:10-14). The Department later removed prisoners under its jurisdiction from

the Facility, but Commissioner Snyder denies that this decision was a result of the higher *per diem* rate.  (<u>Id.</u> at 83:15-23).

The cost to run the Facility increased by approximately $400,000 each year from 2010 to 2012, with expenses reaching $1.9 million in 2012.  (Doc. 61-5 ¶ 12).  Commissioner Snyder represents that he asked Duran for cost-saving suggestions at Prison Board budget meetings and "received no response."  (<u>Id.</u> ¶ 13).  Duran did not recall these alleged requests but noted that he did eliminate the laundry supervisor position.  (<u>See</u> Duran Dep. I 74:4-14, 94:1-4).  Defendants maintain that, at the September 2012 Prison Board meeting, Duran submitted a proposed Facility budget for 2013 projecting $3.2 million in expenses.[3]  (<u>See</u> Doc. 61-1 ¶ 24 (citing Doc. 61-5 ¶ 12); Doc. 63-35 at 3).  Defendants have not produced a copy of this alleged budget.  For his part, Duran has adduced a 2013 budget proposal dated October 6, 2012, which projected total 2013 revenues at approximately $3.28 million and total 2013 expenses at approximately $2.07 million.  (Doc. 63-5 at 1, 7; <u>see</u> Doc. 61-8, Long Dep. 29:17-20, 30:15-31:10).  The Prison Board's October 10, 2012 meeting minutes do not reflect discussion of the proposal dated October 6, 2012.  (Doc. 63-16 at 2-3).

### E.    Request for Medical Leave and Termination

On October 5, 2012, Duran sent a memo by interoffice mail to the Prison Board notifying its members of his shoulder surgery scheduled for October 29, 2012 and his desire to take corresponding medical leave.  (Doc. 61-1 ¶ 32; Duran Dep. I

---

[3] It appears that a line is missing from paragraph 12 of Commissioner Snyder's affidavit, rendering said affidavit silent as to the date this budget proposal was submitted to the Prison Board.  (<u>See</u> Doc. 61-5 ¶ 12).  For purposes of this opinion, we will assume the missing sentence included a September 2012 date.

52:5-11).  Duran projected that he would be able to return to work "on a limited basis" the following week and full time by November 5, 2012.  (Doc. 63-36 at 2). Duran testified that Commissioner Snyder never made any comments or expressed any displeasure at Duran request to take medical leave.  (Duran Dep. I 88:18-22).

The Prison Board required Duran to attend a public Prison Board meeting on October 24, 2012.  (Doc. 61-1 ¶ 33).  During the meeting, Commissioner Long moved to suspend Duran with pay for the remainder of his employment contract and then terminate him.  (Id. ¶ 30; Doc. 63 ¶ 30; Doc. 61-5 ¶ 21).  The Prison Board voted 5-1 to suspend and then terminate Duran (the district attorney was absent from the vote).  (Doc. 61-1 ¶ 31).  Duran was 55 years' old at the time.  (Id. ¶ 41).

Defendants maintain that Duran was fired for various performance issues related to the management and finances of the Facility.  (See Doc. 61-5 ¶ 21; Snyder Dep. 100:24-101:3; Long Dep. 25:11-26:13; see also Doc. 63-15, Conway Dep. 37:11-17).  Commissioner Snyder testified that Duran was not fired in April 2012 for the "questionable" charges to the Facility's commissary account because the Prison Board wanted to give Duran an opportunity to improve his performance.  (Snyder Dep. 98:11-21).  Commissioners Snyder and Long stated that they decided to terminate Duran following an exchange with him during the September 2012 Prison Board meeting.  (Snyder Dep. 101:11-22; Long Dep. 28:24-29:16).  They claim that, in response to a question about how to decrease the $3.2 million in projected expenditures, Duran "shrugged [his] shoulders and said it's up to you guys." (Snyder Dep. 101:11-17; see Long Dep. 28:24-29:6).

Susan Conway ("Conway") served as the assistant chief clerk, payroll clerk, and benefits administrator for the County during the relevant time. (Conway Dep. 15:12-17). She maintained employee personnel files in her office which included performance evaluations. (Id. at 33:21-35:2). According to Conway, Duran's file containing numerous "commendations" and no negative performance evaluations. (Id. at 35:3-25; see Duran Dep. I 82:14-83:12). Conway testified that she knew of Duran's impending suspension before the October 24, 2012 Prison Board meeting. (Conway Dep. 36:11-37:20). She also recalled overhearing the commissioners discussing Duran's medical leave request in the weeks prior to that meeting. (Id. at 37:21-25, 38:16-20).

### F.    Post-Termination

Deputy warden Jackie Motter ("Motter") became the Facility's acting warden after Duran's termination. (Doc. 61-1 ¶ 43; Doc. 61-10, Motter Dep. 14:12-14). At a November 28, 2012 Prison Board meeting, Motter reported that the daily cost to house an inmate at the Facility was $54.79, which she calculated to be a $7.79 loss per day based on the $45 *per diem* rate originally negotiated by Duran. (See Doc. 61-5 ¶ 11). This cost difference resulted in a total loss to the Facility of approximately $254,800 per year. (Id.)

On November 2, 2012, the County began advertising the warden position online. (Doc. 63-41 at 2). Three individuals applied: Wayne Bechdel, then-captain on Facility staff; Ryan Boatman, then-lieutenant on Facility staff; and Motter. (Motter Dep. 25:16-26:1; Doc. 63-22, Bechdel Dep. 10:19-22). The Prison Board interviewed each candidate and selected Motter as the next warden. (Doc. 61-1 ¶ 45;

Bechdel Dep. 13:16-22). Motter was approximately 46 years' old at the time and ten years younger than Duran. (Doc. 61-1 ¶¶ 42b, 46).

### G. Procedural History

Duran commenced this action on October 23, 2014. Following Rule 12 motion practice, a period of discovery, and several amended pleadings, this matter is now proceeding on Duran's third amended complaint. Duran advances claims against the County for retaliation in violation of the FMLA (Count I), discrimination and retaliation in violation of the ADA (Counts III, IV), and discrimination in violation of the ADEA (Counts V, VI). He asserts a common-law claim for tortious interference with contractual relationships against Commissioners Smeltz, Snyder, and Long (Count II). The County brings common-law counterclaims against Duran for conversion and set-off or recoupment of overpayment. Defendants' instant motion for summary judgment pertains to only Duran's claims. The motion is fully briefed and ripe for disposition.

## II. Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v.

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See <u>Pappas</u>, 331 F. Supp. 2d at 315.

### III.   <u>Discussion</u>

Defendants move for summary judgment on Duran's federal discrimination claims against the County and his state-law claim for tortious interference with contractual relationships against the individual defendants.[4]  In response to defendants' motion, Duran has voluntarily withdrawn his tortious interference claim against Commissioners Smeltz and Long.  (Doc. 63 at 58 n.9).  Thus, Duran's state-law claim proceeds against Commissioner Snyder alone.  We begin our analysis with the civil rights claims against the County.

### A.   **FMLA Retaliation**

Duran advances his FMLA retaliation claim under both a mixed-motives and a pretext theory of liability.  (<u>See</u> Doc. 64 at 3-9).  The County argues as a threshold matter that Duran cannot prove his retaliation claim under a mixed-motives theory because he has not identified direct evidence of retaliatory discrimination.  (Doc. 62 at 6-7; Doc. 66 at 3-7).  The quality of evidence in a civil rights action will usually

---

[4] In Counts V and VI, Duran appears to allege claims of age discrimination in violation of the Pennsylvania Human Relations Act ("PHRA").  (Doc. 55 ¶¶ 113, 124).  Duran purportedly filed administrative complaints of age discrimination with the Pennsylvania Human Rights Commission ("PHRC"), (<u>id.</u> at ¶ 107), but acknowledged that, as of the filing of his third amended complaint, the PHRC had not reached a decision on the merits of those claims, (<u>id.</u> at ¶ 109).  To date, Duran has not moved to further amend his complaint, nor has he provided any supplemental information to the court regarding exhaustion with the PHRC.  We are thus constrained to dismiss the PHRA discrimination claims without prejudice. <u>See</u> <u>Clay v. Advanced Comput. Applications, Inc.</u>, 559 A.2d 917, 919-20 (Pa. 1989).

determine which framework applies. Traditionally, direct-evidence claims have been analyzed under the mixed-motives theory articulated in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), and circumstantial-evidence claims have been governed by the burden-shifting paradigm outlined in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Lichtenstein v. Univ. of Pittsburgh Med. Ctr.</u>, 691 F.3d 294, 302 (3d Cir. 2012). However, the Third Circuit recently held that "direct evidence is not required to proceed under a mixed-motive[s] theory of liability" for an FMLA claim in light of the Supreme Court's decision in <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003). <u>Egan v. Del. River Port Auth.</u>, 851 F.3d 263, 274-75 (3d Cir. 2017) (citing <u>Desert Palace</u>, 539 U.S. at 92, 98-99, 101-02). Because we conclude that Duran has adduced sufficient evidence to sustain his FMLA retaliation claim "under the more taxing <u>McDonnell Douglas</u> standard," <u>Lichtenstein</u>, 691 F.3d at 302, we need not analyze this claim under a mixed-motives theory of liability.

Application of the familiar <u>McDonnell Douglas</u> burden-shifting framework to an FLMA retaliation claim proceeds in three steps. <u>See</u> <u>id.</u> First, the plaintiff must establish a *prima facie* case of retaliation. <u>Id.</u> The burden then shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its employment decision. <u>Id.</u> (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802). If the defendant meets its burden, the plaintiff must prove by a preponderance of the evidence that the defendant's articulated reasons for its employment decision were merely pretext for discriminatory retaliation. <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 804-05; <u>Lichtenstein</u>, 691 F.3d at 302.

### 1.    **Prima Facie** *Case*

An employer violates the FMLA by "discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights."  29 C.F.R. § 825.220(c); <u>see</u> <u>Egan</u>, 851 F.3d at 269-72 & n.3 (citing 29 U.S.C. § 2615(a)(1)).  To establish an FMLA retaliation claim, Duran must prove that (1) he invoked his right to FMLA-qualifying leave; (2) he suffered adverse employment action; and (3) the adverse employment action was "causally related to" his invocation of FMLA rights.  <u>Lichtenstein</u>, 691 F.3d at 301-02 (citation omitted).  Duran easily establishes the first two elements.  He sent a memo to the Prison Board on October 5, 2012, stating his intent to take medical leave, and the Prison Board voted on October 24 to suspend and terminate him, five days before his leave period was to begin.  (Doc. 61-1 ¶¶ 30-32; Doc. 63 ¶¶ 30-31).  The parties' arguments regarding Duran's *prima facie* case concenter on the causation prong.[5] (<u>See</u> Doc. 62 at 6-9; Doc. 64 at 3-9; Doc. 66 at 3-7).

Duran must establish causation by "point[ing] to evidence sufficient to create an inference that a causative link exists between [his] FMLA leave and [his] termination."  <u>Lichtenstein</u>, 691 F.3d at 307 (citing <u>Farrell</u>, 206 F.3d at 279-81).  This

---

[5] The causation inquiry under the *prima facie* case "is not easily distinguishable" from the subsequent analysis of pretext.  <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 286 (3d Cir. 2000).  Moreover, caselaw suggests that a plaintiff need not establish causation as part of his or her *prima facie* case.  <u>See</u>, <u>e.g.</u>, <u>Armstrong v. Burdette Tomlin Mem'l Hosp.</u>, 438 F.3d 240, 251 (3d Cir. 2006).  In the interest of completeness, and because the <u>McDonnell Douglas</u> framework does not require that courts "ration the evidence between one stage or the other," <u>Farrell</u>, 206 F.3d at 286, this court will not limit its consideration of the parties' causation arguments to only the *prima facie* case or the pretext stage.

analysis frequently turns on one of two criteria: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 258 (3d Cir. 2014) (citation omitted). Courts have found a lapse of two days to three weeks between protected activity and a retaliatory action to be "unusually suggestive." See Lichtenstein, 691 F.3d at 307 (collecting cases); cf. LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007). When temporal proximity between protected activity and the purported retaliatory action is not unusually suggestive, district courts consider "whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" Lichtenstein, 691 F.3d at 307 (quoting LeBoon, 503 F.3d at 232).

The County terminated Duran less than three weeks after he sent a memo to the Prison Board regarding his scheduled surgery. (See Doc. 61-1 ¶¶ 30-32; Doc. 63 ¶¶ 30-31). The record is unclear as to when this notice was received. Duran opines that his October 5, 2012 memo may not have reached Prison Board members until the following week, (see Duran Dep. I 52:5-11; Doc. 64 at 7), and the October 10, 2012 meeting minutes make no mention of Duran's request,[6] (see Doc. 63-16). Conway testified that she knew the Prison Board was planning to suspend Duran prior to its October 24, 2012 vote on the matter. (Conway Dep. 34:18-37:20). She also claimed to have overheard the commissioners discussing Duran's medical leave request in

---

[6] The October 10 meeting minutes do note that the Prison Board conducted an "Executive Session" of the meeting to "address Personnel issues." (Doc. 63-16 at 3). Duran's medical leave request or his potential suspension and termination may have been discussed during the executive session.

the weeks prior to the October 24 meeting. (Id. at 37:21-25, 38:16-20). Regardless of when in October 2012 the memo was received, the proximity to Duran's termination is sufficiently suggestive of retaliatory discrimination.

Duran has adduced other evidence of a causal connection. The record reflects that his personnel file contained only positive commendations. (Id. at 35:3-25; see Duran Dep. I 82:14-83:12). And Duran's testimony, if believed, suggests that Commissioner Snyder previously evinced animus toward Duran's medical needs by criticizing him in January or February 2012 for not being at the Facility eight hours per day while recovering from a double knee replacement. (Snyder Dep. 21:10-12; Duran Dep. II 34:22-35:5; see Bechdel Dep. 16:9-16). Viewing this evidence collectively, we find that Duran has adequately established a causal connection between his FMLA leave request and suspension and termination.

### 2. *Legitimate, Nondiscriminatory Reason*

The burden now shifts to the County to articulate one or more legitimate, nondiscriminatory reasons for its employment decision. See McDonnell Douglas, 411 U.S. at 802; Lichtenstein, 691 F.3d at 302. This burden is one of production, not persuasion, and requires an employer to submit evidence which, presumed true, permits the conclusion that there was a legitimate and nondiscriminatory reason for its adverse employment action. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

The County maintains that Duran was fired for mismanagement of the Facility's finances and his "complete indifference" to the Prison Board's requests and concerns regarding the Facility's 2013 budget. (See Doc. 62 at 8-9). Defendants point to evidence of overbilling issues occurring under Duran's watch and suspect

charges made by Duran to the commissary account. (Doc. 63-12 at 2; Snyder Dep. 79:12-17, 80:20-82:4; Doc. 61-4; Doc. 61-5 ¶¶ 16-18). Defendants also oppugn Duran's substantive performance, particularly as concerns his negotiation of a low *per diem* rate for housing out-of-county inmates and his alleged proposal of a $1 million budget increase after being asked to reduce costs. (See Doc. 61-5 ¶¶ 9-10, 12-13; Doc. 63-35 at 3). Based upon the foregoing, we find that the County has articulated legitimate, nondiscriminatory reasons for its decision to suspend and terminate Duran.

### 3. *Pretext*

At the third step of the <u>McDonnell Douglas</u> paradigm, the plaintiff may defeat summary judgment by identifying evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Lupyan v. Corinthian Colls. Inc.</u>, 761 F.3d 314, 324 (3d Cir. 2014) (quoting <u>Fuentes</u>, 32 F.3d at 764). A plaintiff must do more than simply claim a decision was wrong or mistaken to discredit a proffered justification. <u>Fuentes</u>, 32 F.3d at 765. The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the County's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,'" <u>Lichtenstein</u>, 691 F.3d at 310 (quoting <u>Fuentes</u>, 32 F.3d at 765), "and hence infer that the employer did not act for [the asserted] non-discriminatory reasons,"

Fuentes, 32 F.3d at 765 (alteration in original) (internal quotation marks and citations omitted).

Duran has amply satisfied his burden at step three.[7]  The County avers that Duran submitted a budget projection for 2013 which included proposed expenses of $3.2 million, a more than 68% increase over the prior year.  (See Doc. 61-5 ¶ 12; Doc. 63-35 at 3).  But defendants have not produced this alleged proposal, which is directly countered by Duran's proffer of a budget proposal dated October 6, 2012, which identifies expected 2013 *revenues* of $3.28 million and *expenses* of about $2.07 million.  (Doc. 63-5 at 1, 7; <u>see also</u> Long Dep. 29:17-20, 30:15-31:10).  As to claims that Duran charged purely personal expenses to the Facility commissary account, Duran testified that not only were those expenses business related, but that the Prison Board never raised the issue with him prior to his termination.  (Duran Dep. I 58:14-64:13, 84:20-85:10).  According to Duran, the Board ambushed him and denied him an opportunity to rebut the allegation of misappropriation.  Duran has demonstrated sufficient weaknesses and inconsistencies in the County's proffered reasons for his termination to allow a reasonable jury to conclude that said reasons was mere pretext for retaliatory discrimination.

---

[7] We note that Duran has not rebutted defendants' evidence with respect to overbilling.  His assertion that no overbilling occurred is arguably inconsistent with his memo of September 2012 reporting that incorrect billing did occur in July 2012.  (See Doc. 63-12 at 2; Snyder Dep. 80:20-82:4).  Because he was fired, he never finished looking into the issue.  (Duran Dep. I 26:11-16, 67:3-16).  Regardless of this ostensibly legitimate performance issue, Duran has presented evidence of pretext sufficient to meet <u>McDonnell Douglas</u> standards.

### B.   ADA Claims

The ADA bars an employer from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Employers are also prohibited from retaliating against an individual for engaging in protected activity, under the statute, which includes making a charge of discrimination, testifying, or "participat[ing] in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 12203(a). Duran presents two theories of recovery in his brief in opposition, to wit: (1) Duran suffered disparate treatment on account of the County's disdain for his ongoing physical disabilities and his related need for accommodations; and (2) the County retaliated against Duran for requesting medical leave and requiring disability accommodations.[8] (See Doc. 64 at 13-17).

#### 1.   *Governing Framework*

Duran asserts his ADA disparate treatment claim under a mixed-motives theory, asserting that "[d]iscovery has revealed direct evidence" of discrimination. (Doc. 64 at 13). Evidence qualifies as "direct" when it is "sufficient to allow the jury to find that the decision makers placed substantial negative reliance on [the protected activity] in reaching their decision." Conoshenti v. Pub. Serv. Elec. & Gas

---

[8] In moving for summary judgment on Duran's ADA claims, the County expresses confusion as to the precise nature of those claims and disputes whether Duran properly exhausted a failure to accommodate claim under the ADA. (See Doc. 62 at 14-18; Doc. 64 at 22-23). Duran did not plead a failure to accommodate claim in his third amended complaint premised on the County's January 2012 conduct, (see Doc. 55), nor does he present any substantive argument in support of such a claim in his brief in opposition, (see Doc. 64). He simply posits that his need for accommodations informed the County's alleged discrimination and retaliation against him. Therefore, we need not address this issue.

Co., 364 F.3d 135, 147 n.10 (3d Cir. 2004) (alteration in original) (internal quotation marks omitted) (quoting Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002)), holding modified by Erdman v. Nationwide Ins. Co., 582 F.3d 500 (3d Cir. 2009). Direct evidence "leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it" when making the challenged employment decision. Fakete, 308 F.3d at 338-39 (citation omitted). Duran points to no direct evidence of disparate treatment (or retaliation) based on disability, and the court has located no such evidence in the record.

As noted *supra*, the Third Circuit recently applied the Supreme Court's rationale in Desert Palace—that a plaintiff may receive a mixed-motives jury instruction irrespective of whether he or she presented direct or circumstantial evidence of a Title VII violation—to FMLA claims. See Egan, 851 F.3d at 274-75 (citing Desert Palace, 539 U.S. at 92, 98-99, 101-02). We are skeptical as to the applicability of Desert Palace's *ratio decidendi* to the ADA. Neither the Supreme Court nor the Third Circuit have extended Desert Palace's rationale to ADA claims. See Raytheon Co. v. Hernandez, 540 U.S. 44, 49 & n.3 (2003) (discussing application of McDonnell Douglas burden-shifting framework to ADA disparate-treatment claim post-Desert Palace); Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761-62 (3d Cir. 2004) (applying same). District courts within the Third Circuit have declined to extend Desert Palace's statute-based rationale to ADA claims. See, e.g., Weirich v. Horst Realty Co., LLC, No. 07-CV-871, 2009 WL 838532, at *3 (E.D. Pa. Mar. 26, 2009) (collecting cases). We need not reach this issue as Duran's ADA claims survive under the more exacting McDonnell Douglas framework.

21

## 2.   *Disparate Treatment and Retaliation*

Neither side fully engages with each step of the <u>McDonnell Douglas</u> framework as to either of Duran's ADA claims.  The County does not dispute Duran's contention that he adduced sufficient evidence to satisfy a *prima facie* case of disparate treatment and retaliation under the ADA.  (<u>Compare</u> Doc. 64 at 13-17 <u>with</u> Doc. 66 at 10-11; <u>see</u> Doc. 62 at 14-16).  As noted *supra* in our discussion of Duran's FMLA claim, the County has set forth a legitimate, nondiscriminatory reason for suspending and terminating his employment.

As in the FMLA context, a plaintiff may defeat summary judgment on an ADA claim at step three by identifying evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  <u>Shaner v. Synthes</u>, 204 F.3d 494, 501 (3d Cir. 2000) (quoting <u>Fuentes</u>, 32 F.3d at 764).  The County asseverates that Duran has identified no evidence that tends to show "his termination was motivated by discriminatory bias on the basis of his disability." (Doc. 62 at 16).  The County underscores Duran's deposition testimony that he "was speculating" that his termination was motivated by discrimination based on temporal proximity and defendants' failure to provide Duran with a specific, valid reason.  (<u>See</u> Duran Dep. II 29:18-33:15).

Duran's inability to identify direct evidence of animus is not fatal to his claims.  Duran has demonstrated numerous weaknesses and inconsistencies in the County's proffered reason for terminating his employment.  <u>Shaner</u>, 204 F.3d

at 501. Duran has undermined the County's primary reason for terminating him (the alleged 2013 budget increase of more than $1 million), and has cast doubt on the County's allegation that he mismanaged the commissary account. Based on this evidence, a reasonable jury could discredit the County's proffered legitimate, nondiscriminatory reason for suspending and terminating Duran.

### C.    ADEA Claims

The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff relying on circumstantial evidence of age discrimination proceeds according to the McDonnell Douglas paradigm. Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (citing Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)). The County assumes for purposes of its Rule 56 argument that Duran has set forth a *prima facie* case of age discrimination, (Doc. 62 at 20), and Duran does not dispute that the County has articulated a legitimate, nondiscriminatory reason for his termination, (see Doc. 64 at 18-20). We therefore turn to step three.

According to the County, Duran's only evidence of discriminatory motive is that the person who replaced Duran was approximately ten years younger. (Doc. 62 at 20, 22). However, we reiterate that to show pretext, Duran need only "point to evidence that would allow a factfinder to disbelieve the [County's] reason for the adverse employment action." Willis, 808 F.3d at 644 (citing Fuentes, 32 F.3d at 764).

For the reasons articulated in our analysis of the FMLA and ADA claims, Duran has

satisfied his step three burden to survive summary judgment on his ADEA claims.

**D.    Tortious Interference with Contractual Relationships**

To prevail on a claim for tortious interference with existing or prospective

contractual relationships under Pennsylvania law, a plaintiff must establish

> (1) the existence of a contractual or prospective
> contractual or economic relationship between the plaintiff
> and a third party; (2) purposeful action by the defendant,
> specifically intended to harm an existing relationship or
> intended to prevent a prospective relation from
> occurring; (3) the absence of privilege or justification on
> the part of the defendant; (4) legal damage to the plaintiff
> as a result of the defendant's conduct; and (5) for
> prospective contracts, a reasonable likelihood that the
> relationship would have occurred but for the defendant's
> interference.

Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009)

(citing Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir.

1998)); see Glenn v. Point Park Coll., 272 A.2d 895, 898 (Pa. 1971).  Our analysis

begins and ends with Commissioner Snyder's contention that Duran's claim fails

because Commissioner Snyder is a party to any actual or prospective contractual

relationship between Duran and the County.

Under Pennsylvania law, "it is axiomatic that a party cannot tortiously

interfere with its own contract."  Bakare v. Pinnacle Health Hosps., Inc., 469 F.

Supp. 2d 272, 294 n.46 (M.D. Pa. 2006) (citing Rutherfoord v. Presbyterian-Univ.

Hosp., 612 A.2d 500, 507-08 (Pa. Super. Ct. 1992)); see also Glazer v. Chandler, 200

A.2d 416, 418 (Pa. 1964).  Section 766 of the Restatement (Second) of Torts, adopted

by the Pennsylvania Supreme Court in Adler, Barish, Daniels, Levin & Creskoff

v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978), defines the tort as intentionally and improperly interfering in a contract "between *another and a third person* by inducing or otherwise causing the third person not to perform the contract." RESTATEMENT (SECOND) OF TORTS § 766 (AM. LAW. INST. 1965) (emphasis added). A corporate agent or officer acting within the scope of his or her authority cannot be considered a third party to a contract between the corporation and the plaintiff. Burton v. Teleflex Inc., 707 F.3d 417, 433 (3d Cir. 2013) (citing Nix v. Temple Univ. of Commonwealth Sys. of Higher Educ., 596 A.2d 1132, 1137 (Pa. Super. Ct. 1991)). Principles of agency apply coextensively to both private and municipal entities. See Justice v. Lombardo, 173 A.3d 1230, 1237-39 (Pa. Commw. Ct. 2017), appeal granted, 187 A.3d 206 (Pa. 2018); Kull v. Guisse, 81 A.3d 148, 158-59 (Pa. Commw. Ct. 2013); Fitzgerald v. McCutcheon, 410 A.2d 1270, 1271-72 (Pa. Super. Ct. 1979).

According to Duran, Commissioner Snyder's actions were motivated by personal or discriminatory animus and thus were not taken within the scope of his authority. (Doc. 64 at 10). Duran points to several district courts within the Third Circuit which have carved out an exception to the general rule against agent liability, holding that an agent may be liable for tortious interference with its employer's contracts when (1) the agent's "sole motive in interfering is actual malice toward the plaintiff," or (2) the agent's actions are against the corporation's interests. Corr. U.S.A. v. McNany, 892 F. Supp. 2d 626, 637 (M.D. Pa. 2012) (collecting cases); see Martin v. Finley, 349 F. Supp. 3d 391, 411 (M.D. Pa. 2018) (citations omitted). We have traced this ostensible exception to Avins v. Moll, 610 F. Supp. 308, 318 (E.D. Pa. 1984), aff'd without opinion, 774 F.2d 1150 (3d Cir. 1985).

Avins, in turn, cited solely to the seminal case of Geary v. United States Steel Corporation, 319 A.2d 174 (Pa. 1974), as support for the proposition that "[t]he overwhelming weight of authority" is that a corporate agent "is *not* personally liable for inducing breach of contract unless the individual's *sole* motive . . . is actual malice directed toward the plaintiff, or the individual's conduct is against the interest of the corporation."  Avins, 610 F. Supp. at 318 (citing Geary generally).

The trouble is that Geary contemplates no such exception.  In Geary, the Pennsylvania Supreme Court recognized for the first time that a violation of a "clear mandate of public policy" may be an exception to the longstanding bar on wrongful discharge actions in the at-will employment context.  See Geary, 319 A.2d at 184-85; see also Shick v. Shirey, 716 A.2d 1231, 1234 n.3, 1238 (Pa. 1998).  The court first distinguished plaintiff's analogy to "unjustified interference" (tortious interference) by noting that the tort involves a third party without the privilege or justification to interfere in a protected employer-employee relationship; the court rejected the analogy as "not . . . particularly helpful."  Geary, 319 A.2d at 176-77. The court then separately discussed plaintiff's suggestion that a wrongful discharge claim in the at-will employment context could be premised on the actor's motive. See id. at 177.  It was in the context of this discussion that the court observed that intentional torts usually have as an element the "specific intent to cause harm or accomplish an ulterior purpose," citing as an example Glenn v. Point Park College, 272 A.2d 895 (Pa. 1971), which held that a party alleging tortious interference with a prospective business relationship must plead a third party's specific intent to cause harm.  Geary, 319 A.2d at 177-78 (citing Glenn, 272 A.2d 895).  The court signaled its

agreement with Geary that a "malicious abuse of recognized rights" might support a wrongful discharge action, but concluded that he had failed to demonstrate such intent. Id. at 177.

We do not read Geary as creating an exception to the general rule that when a corporate agent acts within the scope of his or her authority, the agent cannot be regarded as a third party to the corporation's contracts. Our independent canvas of relevant case law reveals no Pennsylvania state courts adopting such an exception, and one court has expressed reservations about Avins' suggestion that an exception exists in situations where a supervisory agent acts "against the best interest of the employer." Purdy v. Romeo, 613 A.2d 91, 93 n.6 (Pa. Commw. Ct. 1992) (citing Avins, 610 F. Supp. 308). For all of these reasons, we decline to adopt the *ratio decidendi* of the aforementioned district courts and conclude as a matter of law that Commissioner Snyder's purported intent does not render him a third party to any actual or prospective contractual relationship between Duran and the County.[9]

There is otherwise no genuine dispute that Commissioner Snyder was acting within the scope of his authority. Section 228 of the Restatement (Second) of

---

[9] So long as a district court has jurisdiction over a case, it has "the inherent power to reconsider prior interlocutory orders" when consonant with justice to do so. State Nat'l Ins. Co. v. County of Camden, 824 F.3d 399, 406 & n.14 (3d Cir. 2016) (citing United States v. Jerry, 487 F.2d 600, 605 (3d Cir. 1973)). In our memorandum opinion addressing defendants' motion to dismiss, we allowed Duran's tortious interference claim to survive Rule 12 scrutiny based on the ostensible applicability of this exception. Duran v. Cty. of Clinton, No. 4:14-CV-2047, 2015 WL 5675580, at *11 (M.D. Pa. Sept. 25, 2015). Having now found that the exception recognized by these courts rests on unsound footing, we conclude that our application thereof was in error. We will therefore vacate the portion of our opinion permitting Duran to proceed on his claim for tortious interference with contractual relationships.

Agency, adopted by the Pennsylvania Superior Court in <u>Butler v. Flo-Ron Vending Co.</u>, 557 A.2d 730, 736 (Pa. Super. Ct. 1989), explains in relevant part that an agent's conduct is within the scope of employment only if: "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." RESTATEMENT (SECOND) OF AGENCY § 228 (AM. LAW. INST. 1958).

Commissioner Snyder meets these criteria. Commissioner Snyder took the disputed actions in his capacity as a member of the Board of Commissioners and the Prison Board. The conduct challenged by Duran, including the Prison Board's vote to suspend and terminate his employment, took place during official meetings of these respective boards. And Commissioner Snyder's conduct was actuated, at least in part, by his interest in investigating and resolving the Facility's perceived management and financial issues. There is no genuine dispute that, under the applicable common-law rules of agency, Commissioner Snyder was acting within the scope of his authority. Duran cannot maintain a claim for tortious interference with contractual relationships against Commissioner Snyder.

**IV.    Conclusion**

The court will grant in part and deny in part defendants' motion for summary

judgment.  An appropriate order shall issue.


                                          /S/ CHRISTOPHER C. CONNER
                                          Christopher C. Conner, Chief Judge
                                          United States District Court
                                          Middle District of Pennsylvania


Dated:    March 29, 2019